GRASZ, Circuit Judge, concurring in part and dissenting in part.
 

 I concur in part because, while the appointment of counsel would have been appropriate in this case, I agree with the majority that the district court's failure to do so was not reversible under our deferential abuse of discretion standard of review. I respectfully dissent with respect to the district court's grant of summary judgment and corresponding qualified immunity to the prison official defendants.
 

 Under our Constitution, Patric Patterson is afforded the right to protection against cruel and unusual punishment, including protection from violence at the hands of other prisoners.
 
 U.S. Const. amend. VIII
 
 ;
 
 Farmer v. Brennan
 
 ,
 
 511 U.S. 825
 
 , 833,
 
 114 S.Ct. 1970
 
 ,
 
 128 L.Ed.2d 811
 
 (1994). Claims brought to enforce this constitutional right are protected against summary dismissal where there is a genuine dispute of material fact. Fed. R. Civ. P. 56(a). Because this procedural protection has been denied, any chance of Patterson vindicating his Constitutional right has been lost as well.
 

 Security video shows Patterson was brutally and repeatedly assaulted in an open prison barracks. The attacks were so violent he was left with only one eye and must now walk with the aid of a cane.
 

 Although the attacks were recorded by a security camera, no prison official was watching. Neither did they hear his cries, even though the video shows the attacks roused virtually the entire barracks. Patterson eventually gained enough consciousness to make his way to a control booth before being taken for medical treatment. As horrific as the facts may be, however, they do not make Patterson's case; the law does.
 

 On our
 
 de novo
 
 review, we must view the evidence in the light most favorable to Patterson and grant him the benefit of all reasonable inferences.
 
 See
 

 Fed. Ins. Co. v. Great Am. Ins. Co.
 
 ,
 
 893 F.3d 1098
 
 , 1102 (8th Cir. 2018). So viewing the evidence, I believe there is a genuine dispute of material fact as to whether the defendants were deliberately indifferent to the obvious risk of violence by inmates in the prison's open barracks, resulting in the lengthy and brutal beating openly inflicted on Patterson at the hands of another inmate, all unnoticed by any prison official.
 

 At the time he was attacked, Patterson was housed in the Varner Unit of the Arkansas Department of Correction. Barracks # 13 in the Varner Unit is a two-level barracks unit that held Patterson and fifty-three other inmates. Barracks #13 was monitored by a single guard, who was also responsible for monitoring the adjacent Barracks #14, which also held fifty-four inmates. The single guard was assigned to check on those one hundred eight inmates once every thirty minutes, either from the control booth between the two barracks or from a hallway with a glass wall that ran alongside both barracks. Prison policy prevented guards from entering the barracks without another guard present because of the known risk of violence by inmates.
 

 As he was sleeping in the early morning of March 16, 2015, Patterson was attacked by another inmate, Michael Black. Security video footage shows the attack began at around 3:27 a.m. As most inmates were sleeping, Black approached Patterson's bed, wielding what appeared to be a pillow case or bag with a heavy object inside. Black attacked Patterson with a violent succession of twenty blows to the general area of Patterson's head, followed by a kick. During the initial attack, most of the other inmates in the lower level of the barracks woke up and sat up in their beds, though none intervened to stop the attack.
 

 Patterson lay motionless on his bed after this initial attack. However, the violence was not over. Black stood over him and prodded him a couple of times, as if to get him to move. Black then stood over Patterson's bed for about a minute and a half, striking him three more times with the weapon. Black walked away from Patterson's bed, but returned a moment later and kicked him again, after which Patterson fell, limp, out of his bed and onto the floor. Black stood over or near Patterson for nearly another minute as he lay on the floor, before giving a "high-five" or "fist bump" to another inmate as he walked away. Black and other inmates milled about the unit as Patterson lay on the floor. At around 3:32 a.m., Black went back over to where Patterson was lying and kicked him four times and punched him another two times.
 

 No prison officials appeared to hear or see the repeated attacks, notice Patterson lying on the floor, or notice the fact the violent attacks disturbed the other inmates in the barracks. At around 3:38 a.m., a bloodied Patterson pulled himself up and staggered up the stairs from the lower level of Barracks #13, down the hallway to the end of the barracks, and then knocked on the window of the control booth to get someone's attention. He was let out of the barracks and escorted to the infirmary at 3:40 a.m., after which he was taken to the
 hospital. As a result of the attack, Patterson underwent two or three surgeries and ultimately lost one of his eyes. Patterson also testified that he has "nerve damage all on the side of [his] head [and] in [his] mouth," that his "sinuses are messed up all the time," that his "back's been messed up," so that he has to walk with a cane, and that he "get[s] muscle spasms in [his] back and on [his] face," which have to be treated with muscle relaxers.
 

 To be clear, evidence of mere negligence by a prison guard is not sufficient to survive summary judgment.
 
 See
 

 Farmer
 
 ,
 
 511 U.S. at 835
 
 ,
 
 114 S.Ct. 1970
 
 . Likewise, prison officials cannot be held liable for unforeseeable "surprise attacks."
 
 See
 

 Krein v. Norris
 
 ,
 
 309 F.3d 487
 
 , 491 (8th Cir. 2002). I agree with the majority in its conclusion that the evidence does not support an inference that the defendants knew about the
 
 specific threat
 
 posed by the
 
 specific inmate
 
 who attacked Patterson. But Patterson's arguments, as I read them, focus on the defendants' deliberate indifference to the risk of substantial harm posed by the overall lax security at the prison, not on the failure of the defendants to foresee the risk posed by the particular prisoner who attacked him. The absence of evidence showing that the defendants were aware of the risk posed to Patterson by Black in particular is not fatal to Patterson's claim.
 
 See
 

 Farmer
 
 ,
 
 511 U.S. at 843
 
 ,
 
 114 S.Ct. 1970
 
 ("Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.");
 
 Krein
 
 ,
 
 309 F.3d at 491-92
 
 .
 

 My disagreement with the majority is based on its application of the summary judgment standard. Regardless of whether Patterson would ultimately prevail, at this stage of the litigation we are required to resolve factual disputes in his favor and grant him the benefit of all reasonable inferences.
 
 See
 

 Fed. Ins. Co.
 
 ,
 
 893 F.3d at 1102
 
 .
 

 I would conclude there is a genuine dispute of material fact as to whether the risk of inmate violence in the open barracks in this particular prison constituted a substantial risk of serious harm. The dangers posed by housing numerous violent felons together in open barracks has been the source of much litigation.
 
 See, e.g.
 
 ,
 
 Krein
 
 ,
 
 309 F.3d at 491-92
 
 (affirming the denial of prison official defendants' motion for summary judgment where the inmate plaintiff alleged and provided evidence showing that the defendants "fail[ed] to provide adequate security in an open barracks");
 
 Smith v. Arkansas Dep't of Corr.
 
 ,
 
 103 F.3d 637
 
 , 644 (8th Cir. 1996) (noting "the danger to inmates living in open and unsupervised barracks," and that "[t]he thievery, assaults, and hand-crafted weapons that are common in the unsupervised environment of the open barracks illustrate its inherent danger," thus demonstrating a "threat of imminent harm").
 

 Patterson testified that he had "observed many violent attacks [and] robberies" in the barracks. He said that inmates who were labeled as "snitches" were "hurt and/or killed." Patterson had been the victim of a prior assault. Defendant Mazzanti stated that he had been assaulted by inmates twice and had observed another inmate-on-inmate assault. As a firsthand observer, Patterson also stated in his verified complaint that there was "the propensity for violence in an unattended barracks," and "due to staff shortage, the likelihood of inmate assaults [was] highly likely."
 
 See
 

 Roberson v. Hayti Police Dep't
 
 ,
 
 241 F.3d 992
 
 , 994-95 (8th Cir. 2001) (discussing verified complaints). Prison policy dictated that officers could not even enter the barracks unless accompanied by another officer
 because of the risk of violence by inmates. And at least one inmate had previously been killed by another inmate in the Varner Unit.
 

 In
 
 Jensen v. Clarke (Jensen II)
 
 , this Court affirmed the district court's finding that the Nebraska State Penitentiary's practice of housing two inmates in a single cell and assigning cellmates on a random basis resulted in a substantial risk to inmates of serious harm by cellmate assault.
 
 94 F.3d 1191
 
 , 1198 (8th Cir. 1996). While the record in this case is not as well developed as that in
 
 Jensen II
 
 - likely due in large part to Patterson litigating this case without the assistance of counsel and the defendants' refusal to produce in discovery any information about the number of prior assaults in Barracks #13 and the Varner Unit - there is nevertheless sufficient evidence upon which a reasonable factfinder could conclude that Patterson was "incarcerated under conditions posing a substantial risk of serious harm."
 
 Smith
 
 ,
 
 103 F.3d at 644
 
 (quoting
 
 Jensen v. Clarke (Jensen I)
 
 ,
 
 73 F.3d 808
 
 , 810 (8th Cir. 1996) ).
 

 I would also conclude there is a genuine dispute of material fact as to whether the defendants knew of the risk of harm.
 
 See
 

 Farmer
 
 ,
 
 511 U.S. at 837
 
 ,
 
 114 S.Ct. 1970
 
 ("[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of ... an excessive risk to inmate health or safety."). As the Supreme Court explained in
 
 Farmer
 
 , "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."
 
 Farmer
 
 ,
 
 511 U.S. at 842
 
 ,
 
 114 S.Ct. 1970
 
 . As a result, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." On this issue too, we are required to view the evidence in the light most favorable to Patterson and give him the benefit of all reasonable inferences.
 
 Fed. Ins. Co.
 
 ,
 
 893 F.3d at 1102
 
 .
 

 Viewing the evidence in the light most favorable to Patterson, a reasonable factfinder could conclude that the defendants knew about the obvious risk of violence inmates like Patterson faced at the hands of other inmates in this barracks. Patterson's verified complaint states that the defendants knew of the substantial risk of inmate violence and knew that this risk was exacerbated by a lack of sufficient security and supervision. He also stated that "[t]he Varner Unit is a Maximum Security Unit, housing a variety of potentially violent inmates." The prison's own policy against an officer entering prison barracks without another officer is evidence that the defendants knew of, and took seriously, the risk of inmate violence in the barracks. A reasonable factfinder could infer that the defendants knew that housing fifty-four violent felons together in an open barracks with minimal supervision and apparently no real-time video monitoring produces a substantial risk of inmate-on-inmate violence.
 

 I would also conclude that there is a genuine dispute of material fact as to whether the defendants were deliberately indifferent to the risk of harm. The record contains conflicting evidence as to whether security checks were regularly performed and whether the entire barracks could even be seen from the control booth. While several defendants stated in interrogatory answers that security checks are performed every thirty minutes, Patterson presented an affidavit of a former Varner Unit inmate who worked cleaning hallways and witnessed many officers not performing security checks and sitting in their chairs in the control booth with their backs turned to the barracks. Patterson stated in
 his own affidavit that he had "witnessed [multiple] officers logging down security checks in their logs and never doing them." He also stated that he had seen zone sergeants not doing their security checks for 2 to 3 hours at a time and had seen "officers catching up their logs hours later[,] falsifying their documents." He also stated that he had seen "officers watching fights in the [barracks] and not reporting it to their superior." Patterson stated in his verified complaint that the guard on duty at the time of the attack "was not present in the booth or in the vicinity of the barracks where he could observe the activity in the barracks," but that the guard "knew that if he did not pay attention to what was going on inside the barracks with direct supervision, the potential for inmate assaults existed."
 

 It is undisputed that security checks were not regularly performed
 
 inside
 
 the barracks and there is conflicting evidence regarding whether the barracks can be safely monitored from the outside. Defendant Bolden stated, "Due to [the fact] the wall facing the hall is made of glass, visual checks can be conducted from the hallway and the control booth for each barracks." However, Patterson stated that "[t]he rack/bed where I was assaulted 23 times with a weapon and stomped on 6 times for approx[imately] 11 minutes cannot be seen from the booth." He also said that in the hallway, only one barracks is visible at a time - and one officer is responsible for monitoring two different two-level barracks. Another inmate who had worked in the hallways doing janitorial work stated in his affidavit that "you can't even see the whole barracks from those little [control booth] windows."
 

 The statements in the record by the defendants are ambiguous as to whether they claim security checks were performed every thirty minutes from
 
 both
 
 the booth and hallway or from
 
 either
 
 the booth and hallway, which is relevant because of the evidence that the entire barracks could not be seen from the security booth (and this ambiguity must be construed in favor of Patterson on summary judgment). Moreover, the record establishes activity in the barracks was recorded on security cameras, but monitoring the video was not described by the defendants as part of the security routine. A reasonable factfinder could conclude that the defendants knew their security policy as practiced was insufficient to protect inmates from the obvious and substantial risk of violence by other inmates and that the defendants disregarded that risk. The fact that Patterson was openly and repeatedly attacked with most of the other inmates in the unit looking on, while prison officials apparently had no idea this was occurring until a blood-covered Patterson pulled himself off the floor and staggered up the stairs and down the hall to the control booth window, lends support to that conclusion.
 

 The applicable legal standard here does not allow for summarily rejecting Patterson's claim without a trial. The Federal Rules of Civil Procedure contain a clear requirement that a movant seeking summary judgment must show that "no genuine dispute as to any material fact" exists. The "material fact" provision is a textual standard authorized by Congress,
 
 28 U.S.C. §§ 2071
 
 - 2074, and this Court, under
 
 de novo
 
 review, must apply the rule as written. Under this standard, I believe Patterson's claim should survive.
 

 In sum, viewing the evidence in the light most favorable to Patterson and granting him the benefit of all reasonable inferences, I would conclude there is a genuine dispute of material fact precluding summary judgment. I would affirm the district court's denial of Patterson's motions for appointed counsel under our abuse of discretion standard of review, but reverse its
 grant of the defendants' motion for summary judgment.